UNITED STATES of America,
Plaintiff,

and

Lower Elwha Band of S'Klallams;
Jamestown Band of S'Klallams; Port
Gamble Band of S'Klallams; and the
Skokomish Indian Tribe, Plaintiffs–
Appellees,

v.

LUMMI INDIAN TRIBE, Defendant–
Appellant,

No. 98–35964.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 2000

Filed Dec. 13, 2000

Harry L. Johnsen, Raas, Johnsen & Stuen, P.S., Bellingham, Washington, for the defendant-appellant.

Kathryn J. Nelson, Eisenhower & Carlson, PLLC, Tacoma, Washington, for the plaintiffs-appellees.

Before: SCHROEDER, BEEZER and HAWKINS, Circuit Judges.

BEEZER, Circuit Judge:

The Lummi Indian Tribe appeals from the final judgment entered in favor of the Lower Elwha Band of S'Klallams, the Jamestown Band of S'Klallams, the Port Gamble Band of S'Klallams and the Skokomish Indian Tribe (collectively "the Four Tribes"). The district court concluded that Judge Boldt, in *United States v. Washington*, 384 F.Supp. 312, 332 (W.D.Wash.1974) (Boldt, J.) (hereinafter *"Decision I"*), *aff'd*, 520 F.2d 676 (9th Cir. 1975), did not intend for the Lummi's usual and accustomed fishing grounds and stations to include the Strait of Juan de Fuca, Admiralty Inlet or the mouth of the Hood Canal. We have jurisdiction pursuant to 28 U.S.C. § 1291. We conclude that Judge Boldt intended to: (1) exclude the Strait of Juan de Fuca and the mouth of the Hood Canal and (2) include Admiralty Inlet in the Lummi's usual and accustomed fishing grounds and stations. We affirm in part and reverse in part.

I

This appeal involves the scope of fishing rights secured by the Lummi Indian Tribe in the 1855 Treaty of Point Elliott. Tribes who were party to the Treaty, including the Lummi, reserved the right to fish at all "usual and accustomed grounds and stations." Act of Jan. 22, 1855, Art. V, 12 Stat. 927, 928. The term "usual and accustomed grounds and stations" includes "every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters." *Decision I*, 384 F.Supp. at 332.

The United States filed the underlying action in *Decision I*, on its own behalf and as trustee for several Western Washington Indian tribes, to enforce compliance by the State of Washington with treaty fishing rights. *See Decision I*, 384 F.Supp. at 327–28. As part of *Decision I*, Judge Boldt determined the various tribes' usual and accustomed fishing grounds and stations. With respect to the Lummi, Judge Boldt described their usual and accustomed grounds and stations as follows:

45. Prior to the Treaty of Point Elliott, the Lummi, Semiahmoo and Samish Indians had been engaged in trade in salmon, halibut and shellfish with other Indians and with non-Indians. This trade continued after the treaty. At the time of the treaty they maintained prosperous communities by virtue of their ownership of lucrative saltwater fisheries. The single most valuable fish resource was undoubtedly the sockeye, which the Lummis were able to intercept in the Straits on the annual migration of the sockeye from the ocean to the Fraser River. Lummi Indians developed a highly efficient technique, known

as reef netting, for taking large quantities of salmon in salt water. Aboriginal Indian "reef netting" differs from present methods and techniques described by the same term. The Lummis had reef net sites on Orcas Island, San Juan Island, Lummi Island and Fidalgo Island, and near Point Roberts and Sandy Point. When nature did not provide optimum reef conditions the Indians artificially created them. Reef netting was one of the two most important economic activities engaged in by these Indians, the other being the sale of dog fish oil. These Indians also took spring, silver and humpback salmon and steelhead by gill nets and harpoons near the mouth of the Nooksack River, and steelhead by harpoons and basketry traps on Whatcom Creek. They trolled the waters of the San Juan Islands for various species of salmon.

46. *In addition to the reef net locations listed above, the usual and accustomed fishing places of the Lummi Indians at treaty times included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay.* Freshwater fisheries included the river drainage systems, especially the Nooksack, emptying into the bays from Boundary Bay south to Fidalgo Bay. *Id.* at 360 (citations to the record omitted) (emphasis added).

Almost fifteen years after *Decision I,* the Four Tribes initiated Subproceeding 89–2 by filing a request for determination, pursuant to the continuing jurisdiction of the court.[1] The Four Tribes sought a determination that the Lummi were violating *Decision I* by fishing in areas outside of their adjudicated usual and accustomed grounds and stations, specifically in the Strait of Juan de Fuca, Admiralty Inlet and the mouth of the Hood Canal. The Four Tribes claim these same fishing areas as part of their usual and accustomed grounds and stations.

The Four Tribes and the Lummi both moved for summary judgment as to whether the disputed areas were contained within the Lummi's usual and accustomed grounds and stations. Judge Coyle, a visiting judge assigned to preside at many of the *Decision I* subproceedings, determined that Judge Boldt had not intended the disputed areas to be included within the Lummi's usual and accustomed grounds and stations. On February 15, 1990, Judge Coyle granted the Four Tribes' motion for summary judgment and denied the Lummi's motion. Although no apparent

1. Paragraph 25 of the injunction entered by Judge Boldt in *Decision I* provides in pertinent part:

   The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:

    a. whether or not the actions, intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision # I or this injunction;

    b. whether a proposed state regulation is reasonable and necessary for conservation;

    c. whether a tribe is entitled to exercise powers of self-regulation;

    d. disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves;

    e. claims to returns of seized or damaged fishing gear or its value, as provided for in this injunction;

    f. the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # I; and

    g. such other matters as the court may deem appropriate.

In order to invoke such jurisdiction, the party shall file with the clerk of this court and serve upon all other parties (through their counsel of record, if any) a "Request for Determination" setting forth the factual nature of the request and any legal authorities and argument which may assist the court, along with a statement that unsuccessful efforts have been made by the parties to resolve the matter, whether a hearing is required, and any factors which bear on the urgency of the request.

*Decision I,* 384 F.Supp. at 419.

issues remained pending, a final judgment was not entered.

Instead, the Lummi filed an amended response to the Four Tribes' request for determination and a cross-request for determination on April 12, 1990.[2] The cross-request sought a determination that the Lummi's usual and accustomed grounds and stations should be expanded to include the three disputed areas.[3]

Based on the Lummi's "expansion" theory, several years of discovery ensued, after which the parties again filed cross-motions for summary judgment. By this point, Subproceeding 89–2 had been transferred to Judge Rothstein. On February 7, 1994, Judge Rothstein denied both summary judgment motions. Judge Rothstein concluded that, despite the weakness of the Lummi's evidence, genuine issues of material fact remained as to whether the disputed areas should be added to the Lummi's usual and accustomed grounds and stations.

During the next few years, the parties were heavily involved in the litigation of other subproceedings. Consequently, the trial in Subproceeding 89–2 was repeatedly delayed. In the meantime, an opinion was filed in *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir.1998).

One month prior to the now seemingly-firm trial date of June 15, 1998, the Lummi moved to vacate that date and to reopen discovery, arguing essentially that *Muckleshoot* required reframing of the issues. According to the Lummi, the correct focus was no longer whether the disputed areas should be added to the usual and accustomed grounds and stations, but rather

whether Judge Coyle correctly determined in 1990 that the areas were not intended by Judge Boldt to be included in the findings of *Decision I*. The Lummi argued that Judge Coyle impermissibly relied on latter-day evidence that was not presented to Judge Boldt in order to determine Judge Boldt's intent.

The Four Tribes opposed the Lummi's motion, and moved to dismiss the Lummi's cross-request for determination. Judge Rothstein denied the Lummi's motion to vacate the trial date and later entered an order setting a briefing schedule to resolve the outstanding issues. The Lummi then moved to dismiss or, in the alternative, for summary judgment.

On September 1, 1998, Judge Rothstein denied the Lummi's alternative motions and granted the Four Tribes' motion to dismiss. Judge Rothstein applied the law of the case doctrine and accepted Judge Coyle's 1990 decision that Judge Boldt did not intend to include the Strait of Juan de Fuca, Admiralty Inlet or the mouth of the Hood Canal in the Lummi's usual and accustomed grounds and stations. Final judgment was entered on September 2, 1998, dismissing Subproceeding 89–2. The Lummi timely appeal.

## II

At the outset, the Four Tribes raise two arguments as to why we should not review Judge Coyle's 1990 summary judgment order, which established that Judge Boldt did not intend to include the disputed areas within the Lummi's usual and accustomed grounds and stations. First, the

---

**2.** The Lummi's "amended" response contained no actual amendments; rather, it stated that "[t]he Answer and Affirmative Defenses previously pled ... are not changed, and will not, in the interest of the conservation of trees and filing cabinets, be repeated here."

**3.** The cross-request for determination was purportedly filed pursuant to the authority of a minute order entered by Magistrate Judge Weinberg on June 28, 1989. The text of that order: (1) directed the parties to file cross-

motions for summary judgment as to the Lummi's usual and accustomed grounds and stations and the availability of equitable defenses; (2) stated that further discovery would wait until after the decision on the summary judgment motions; and (3) recognized that the Lummi intended to file amended pleadings, but that responses to those pleadings would not be due until after a decision on the summary judgment motions.

Four Tribes argue that the order was final in 1990, thus any attempt by the Lummi to appeal now is untimely. Second, the Four Tribes argue that Judge Rothstein's application of the law of the case doctrine insulates Judge Coyle's order from review. We address each argument in turn.

### A.

■ According to the Four Tribes, Judge Coyle's 1990 decision was a final one, from which the Lummi may no longer appeal. Thus, the Four Tribes argue that we are limited to reviewing only Judge Rothstein's application of the law of the case doctrine and not the merits of the usual and accustomed grounds and stations dispute.

■ Section 1291 confers jurisdiction on us to hear "appeals from all final decisions of the district courts." 28 U.S.C. § 1291. "A final decision is one that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Does v. Advanced Textile Corp.*, 214 F.3d 1058, 1065–66 (9th Cir.2000) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)). We observe that "[a] ruling is final for purposes of § 1291 if it (1) is a full adjudication of the issues, and (2) clearly evidences the judge's intention that it be the court's final act in the matter." *National Distribution Agency v. Nationwide Mut. Ins. Co.*, 117 F.3d 432, 433 (9th Cir.1997) (citation and internal quotation marks omitted).

The Lummi contend that Magistrate Judge Weinberg's minute order is evidence that Judge Coyle's subsequent order was not intended to be final. According to the Lummi, the minute order contemplat-ed the filing of amended pleadings after the summary judgment motions were resolved. This contention is unavailing. The order states that "*[r]esponses* [to the Lummi's amended pleadings] are not due until after a decision on the motions." The order does not state that the amended pleadings themselves may be filed after disposition of the summary judgment motions. Moreover, when read in context, it is clear that Magistrate Judge Weinberg's minute order was intended to save the parties the effort and expense of preparing additional discovery and responses, if such were not necessary. Once Judge Coyle granted the Four Tribes summary judgment, further litigation was no longer necessary.

Even though Judge Coyle's disposition of the summary judgment motions left no issues to be resolved, the Lummi amended their pleadings to assert a cross-request for determination.[4] Both parties then continued to actively litigate, with no opposition from the district court.[5] Most importantly, no final judgment was entered. *See* Fed.R.Civ.P. 58 ("Every judgment shall be set forth on a separate document.").

■ Although Rule 58 requires the entry of a separate document, the existence of such a document is not a prerequisite to appellate jurisdiction under § 1291. *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 385, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (per curiam). Nevertheless, Rule 58 serves to protect parties from uncertainty. *See, e.g., Ingram v. ACandS, Inc.*, 977 F.2d 1332, 1339 (9th Cir.1992) ("[A] party should not have to run the risk that the order he may choose to appeal from may

---

4. Judge Rothstein's "Order Denying Lummi's Motion to Dismiss and for Summary Judgment and Granting the Four Tribes' Motion to Dismiss" erroneously asserted that the Lummi filed their cross-request for determination *before* Judge Coyle issued his decision. The Lummi, however, did not file their amended pleading until approximately two months *after* Judge Coyle granted summary judgment to the Four Tribes.

5. If the Four Tribes believed Judge Coyle's ruling constituted a final judgment, they could have moved to dismiss the Lummi's amended response and cross-request for determination at the time it was filed.

not be the same order a court of appeals decides he should have chosen.").

In light of the purpose of Rule 58, we conclude that Judge Coyle's 1990 summary judgment order was not final because no separate judgment was entered.

### B.

■ The Four Tribes next argue that Judge Rothstein's application of the law of the case doctrine insulates Judge Coyle's summary judgment order from review. This argument also lacks merit. Judge Coyle's decision, which was not final, merged into the final judgment entered on September 2, 1998, and may be challenged in this appeal. *See Hook v. Ariz. Dep't of Corrections,* 107 F.3d 1397, 1401 (9th Cir. 1997) ("A party does not lose the right to appeal an interlocutory order by not immediately appealing and waiting for the final judgment. The interlocutory order merges in the final judgment and may be challenged in an appeal from that judgment.") (citation and internal quotation marks omitted).

### III

We address the merits of this appeal. The Lummi challenge both Judge Coyle's summary judgment order and Judge Rothstein's refusal to revise that order. We address each argument in turn.

### A.

The Lummi argue that Judge Coyle erred in granting summary judgment to the Four Tribes because Judge Boldt intended to include the Strait of Juan de Fuca, Admiralty Inlet and the mouth of the Hood Canal within the Lummi's usual and accustomed fishing grounds and stations. This court reviews a grant of summary judgment de novo. *See Balint v. Carson City,* 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).

The question before Judge Coyle was whether the Lummi's usual and accustomed grounds and stations, as expressed in Finding of Fact 46 of *Decision I*—"the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle"—included the disputed areas. The phrase used by Judge Boldt is ambiguous because it does not delineate the western boundary of the Lummi's usual and accustomed grounds and stations.[6] "When interpreting an ambiguous prior judgment, the reviewing court should 'construe a judgment so as to give effect to the intention of the issuing court.'" *Muckleshoot,* 141 F.3d at 1359 (quoting *Narramore v. United States,* 852 F.2d 485, 490 (9th Cir.1988)).

To determine whether Judge Boldt intended to include the disputed areas within the Lummi's usual and accustomed grounds and stations, Judge Coyle looked at the evidence presented to Judge Boldt, specifically those exhibits which Judge Boldt referred to in Findings of Fact 45 and 46. These exhibits consisted of summaries and reports prepared by Dr. Barbara Lane, a noted anthropologist who testified as an expert witness in *Decision I,* as well as maps that she relied on in her testimony. These exhibits were submitted for Judge Coyle's review via a declaration prepared by Dr. Lane. In that declaration, Dr. Lane identified and authenticated the exhibits. Dr. Lane also made the following statements with respect to what she intended at the time of *Decision I:*

4. The Straits referred to in my report—USA Exhibit 30, at p. 11—although not specifically denominated therein, were Haro, Rosario and Georgia Straits and I did not intend the reference to include the Strait of Juan de Fuca. * * *

5. At the time of my 1973 reports and testimony, I had not reached, ex-

---

**6.** Although the Lummi attempt to characterize Findings 45 and 46 as unambiguous, they concede that "[t]here may be some ambiguity about the westerly limit of Lummi fishing rights[.]" *See* Lummi Br. at 12 n. 5.

pressed or intended any conclusion that the treaty-time [usual and accustomed] fishing grounds and stations of the predecessor Indians to the present Lummi Tribe included (1) the Strait of Juan de Fuca, (2) the open marine water beyond the immediate near shore area southwesterly of the San Juan Islands and westerly of northern Whidbey Island, or the Admiralty Inlet passageway along the west side of Whidbey Island.

\* \* \*

In the time available before the presently scheduled court hearing on this subproceeding, I am unable to formulate a conclusion on treaty-time existence or extent of fishing activity by those Lummi predecessors in those waters.

6. I do not consider the term "Northern Puget Sound" as used in the Court's Finding No. 46 or any other language in the Court's Findings to include the Strait of Juan de Fuca, or the Hood Canal area waters southerly of a line from Olele Point to the tip of Foulweather Bluff.

█ The Lummi argue that Judge Coyle improperly considered Dr. Lane's declaration because it constituted latter-day testimony which, after *Muckleshoot,* is not proper evidence of Judge Boldt's intent. *Muckleshoot* held—in a different subproceeding, but one which also involved the Lummi and Dr. Lane—that "to treat the definition of the phrase ['present environs of Seattle'] first articulated by Dr. Lane in her August 1995 deposition as having been adopted by Judge Boldt in 1972 is pure speculation. Accordingly, the district court erred by considering Dr. Lane's latter-day testimony as evidence of Judge Boldt's intended meaning." 141 F.3d at 1359–60. Elsewhere in *Muckleshoot,* the court approved of the statement that "the only matter at issue is the meaning of Judge Boldt's Finding No. 46 and the only relevant evidence is that which

was considered by Judge Boldt when he made his finding." *Id.* at 1360. In the final sentence of the opinion, however, the court left open the possibility that extrinsic evidence might be appropriately considered in determining Judge Boldt's intent: "While evidence that was before Judge Boldt when he made his finding is obviously relevant, there may be other evidence indicative of the contemporary understanding of 'the present environs of Seattle.'" *Id.* at 1360.

The facts of *Muckleshoot* are distinguishable. There, Dr. Lane's latter-day testimony was "the only authority capable of clarifying the meaning of that phrase ['present environs of Seattle']." *Muckleshoot,* 141 F.3d at 1360. Here, although Judge Coyle considered Dr. Lane's declaration, it is clear that he did not rely on it. Instead, he focused directly on the exhibits attached to Dr. Lane's declaration, USA–20 and USA–30, which were presented to Judge Boldt in *Decision I.*

Judge Coyle's order makes it clear that he properly relied on evidence that was put before Judge Boldt, and not upon latter-day testimony. For instance, Judge Coyle stated that "the court examines *the evidence presented to Judge Boldt* in connection with the underlying proceeding." (Emphasis added.) Judge Coyle also concluded that "[t]here is no question in the court's mind *from the evidence presented to Judge Boldt* that the Lummis' usual and accustomed fishing places were not intended to include the Strait of Juan de Fuca." (Emphasis added.) We hold that Judge Coyle's opinion does not run afoul of *Muckleshoot* because there is no indication that Judge Coyle imputed Dr. Lane's later-announced intentions to Judge Boldt.

The Lummi also argue that Judge Coyle erred by not considering all of the evidence submitted to Judge Boldt in *Decision I* in context. The Lummi contend that Judge Boldt intended to define fishing areas in a broad and general way. They

rely on a section of Dr. Lane's 1972 summary, in which she wrote:

> Although there are extensive records and oral history from which many specific fishing locations can be pinpointed, it would be impossible to compile a complete inventory of any tribe's usual and accustomed grounds and stations. Such an inventory is possible only by designating entire water systems.

Dr. Lane also indicated that "[t]here are a variety of reasons why any listing of usual and accustomed fishing sites must be incomplete and thus give a spurious kind of accuracy."

Although this argument is somewhat compelling, it ignores the fact that evidence was also presented by Dr. Lane as to the specific locations of the Lummi's usual and accustomed grounds and stations. For instance, Dr. Lane described the principal fisheries of the Lummi as including several named areas, "Point Roberts, Village Point, off the east coast of San Juan Island ... Bellingham Bay." She also concluded that:

> The traditional fisheries of the post-treaty Lummi included reef net sites in the San Juan Islands, off Point Roberts, Birch Point, Cherry Point, and off Lummi Island and Fidalgo Island. Other fisheries in the Straits and bays from the Fraser River south to the present environs of Seattle were utilized. Freshwater fisheries included the river drainage systems emptying into the bays from Boundary Bay south to Fidalgo Bay.

As noted above, it is the specific, rather than the general, evidence presented by Dr. Lane that Judge Boldt cited as support for his findings of fact regarding the Lummi's usual and accustomed grounds and stations. See Decision I, 384 F.Supp. at 360–61. None of Dr. Lane's testimony identified specific areas as far west and south as the Lummi now claim. Although Judge Boldt heard testimony from Lummi elders who stated that they had fished as far west as the Strait of Juan de Fuca, it is

clear that he did not rely on this testimony in determining the location of the Lummi's usual and accustomed grounds and stations. It is entirely reasonable to conclude that Judge Boldt found this testimony to be self-serving, see United States v. Lummi Indian Tribe, 841 F.2d 317, 319 (9th Cir.1988) (noting that "elder testimony is not the most accurate, documentary evidence"), choosing instead to rely on Dr. Lane, whose testimony he found to be "authoritative" and "reliable." Decision I, 384 F.Supp. at 350.

■ The Lummi argue strenuously that the term "Puget Sound" encompasses "the Strait of Juan de Fuca." Evidence in the record, however, demonstrates that Judge Boldt did not intend the term "Puget Sound" to be so inclusive. When comparing those Indian tribes that were active in marine fisheries, Judge Boldt found that "[t]he Makahs and Quileute have troll fisheries off the coast. The Makahs also pursue both troll and gill net fishing in the Strait of Juan de Fuca. The Lummi Indians use gill nets in Puget Sound." Decision I, 384 F.Supp. at 385. Other examples from Decision I include:

> ... There are presently eight [Makah] boats of commercial size fishing on the high seas. Three of these boats are gill netting in the Strait of Juan de Fuca, four are trolling, and one is tuna fishing.... These commercial boats go as far as fifty miles out to sea, east to Puget Sound and south to Westport and the Columbia River.

Id. at 364–65 (emphasis added).

> The Department of Fisheries has authority to impose limitations on the time, place and manner of sport and commercial fishing for salmon in the off-shore areas within the three-mile limit, in the Strait of Juan de Fuca and Puget Sound....

Id. at 390 (emphasis added). It is clear that Judge Boldt viewed Puget Sound and the Strait of Juan de Fuca as two distinct regions, with the Strait lying to the west of

the Sound. Had he intended to include the Strait of Juan de Fuca in the Lummi's usual and accustomed grounds and stations, he would have used that specific term, as he did elsewhere in *Decision I.*

Similarly, if Judge Boldt had intended to include the mouth of the Hood Canal, which lies south of Whidbey Island, in the Lummi's usual and accustomed grounds and stations, he would not have limited the Lummi's usual and accustomed grounds and stations to "*Northern* Puget Sound." *See Decision I,* 384 F.Supp. at 360 (emphasis added). That Judge Boldt viewed "Northern Puget Sound" as a different area than "Hood Canal" is also evident from the following language in *Decision I:*

> Although not all tribes fished to a considerable extent in marine areas, the Lummi reef net sites in *Northern Puget Sound,* the Makah halibut banks, *Hood Canal* and Commencement Bay and other bays and estuaries are examples of some Indian usual and accustomed fishing grounds and stations in marine waters.

*Id.* at 353 (emphasis added).

■ Determining Judge Boldt's intent with respect to "Admiralty Inlet" is more difficult. *Decision I* is devoid of references to "Admiralty Inlet." Thus, there are no linguistic clues to compare, as there were for both of the other disputed areas. Nevertheless, the Four Tribes argue that because this area was not specifically named as part of the Lummi's usual and accustomed grounds and stations, it was not intended to be included. This argument fails because there is no indication that Judge Boldt recognized Admiralty Inlet as a region separate from "Northern Puget Sound"; it is just as likely that this area was intended to be included as that it was not.

Geographically, however, Admiralty Inlet was intended to be included within the "marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle." Admiralty Inlet consists of the waters to the west of Whidbey Island, separating that island from the Olympic Peninsula. Admiralty Inlet would likely be a passage through which the Lummi would have traveled from the San Juan Islands in the north to the "present environs of Seattle." If one starts at the mouth of the Fraser River (a Lummi usual and accustomed fishing ground and station, *see* Findings of Fact 45 & 46) and travels past Orcas and San Juan Islands (also Lummi usual and accustomed grounds and stations, *see* Finding of Fact 45), it is natural to proceed through Admiralty Inlet to reach the "environs of Seattle." *See Decision I,* 384 F.Supp. at 360.

## B.

■ The Lummi also challenge Judge Rothstein's refusal to disturb Judge Coyle's decision. We conclude that Judge Rothstein properly applied the law of the case doctrine.

■ "The law of the case doctrine is a judicial invention designed to aid in the efficient operation of court affairs." *Milgard Tempering, Inc. v. Selas Corp. of Am.,* 902 F.2d 703, 715 (9th Cir.1990). Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case. *See id.* For the doctrine to apply, the issue in question must have been "decided explicitly or by necessary implication in [the] previous disposition." *Liberty Mutual Ins. Co. v. EEOC,* 691 F.2d 438, 441 (9th Cir. 1982). Application of the doctrine is discretionary. *See United States v. Mills,* 810 F.2d 907, 909 (9th Cir.1987). A trial judge's decision to apply the doctrine is thus reviewed for an abuse of discretion. *See Milgard Tempering,* 902 F.2d at 715.

■ In this case, the issue in question—whether Judge Boldt intended for the three disputed areas to be included in the Lummi's usual and accustomed grounds and stations—was explicitly decided by Judge Coyle. Therefore, Judge Rothstein abused her discretion in applying the law of the case doctrine only if: (1) the first decision was clearly erroneous;

(2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result. *See United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir.1998). The Lummi contest only the second factor, arguing that *Muckleshoot* constituted an intervening change in the law.

As discussed in Section III–A, Judge Coyle's summary judgment order did not violate *Muckleshoot*; Judge Coyle looked to the record before Judge Boldt. Thus, Judge Rothstein did not abuse her discretion in applying the law of the case.

## IV

We are persuaded that Judge Boldt did not intend for either the Strait of Juan de Fuca or the mouth of the Hood Canal to be included within the Lummi's usual and accustomed grounds and stations. Based on the geography of the area, however, we conclude that Judge Boldt did intend to include Admiralty Inlet. We affirm Judge Rothstein's order of dismissal in part, and reverse it in part.

AFFIRMED IN PART AND REVERSED IN PART.