**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UPPER SKAGIT TRIBE,
        *Plaintiff-Appellee,*
    and
UNITED STATES OF AMERICA,
        *Plaintiff,*
    v.
STATE OF WASHINGTON,
        *Defendant,*
    and
SUQUAMISH INDIAN TRIBE,
        *Defendant-Appellant,*
    v.
JAMESTOWN S'KLALLAM TRIBE;
LOWER ELWHA KLALLAM TRIBE;
LUMMI INDIAN NATION; NISQUALLY
INDIAN TRIBE; PORT GAMBLE
S'KLALLAM TRIBE; SKOKOMISH
INDIAN TRIBE; TULALIP TRIBE,
        *Plaintiff-intervenors-Appellees,*
SWINOMISH INDIAN TRIBAL
COMMUNITY,
        *Cross-claimant-Appellee.*

No. 07-35061
D.C. Nos.
CV-70-09213-RSM
SP-05-00003-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
October 21, 2008—Seattle, Washington

10533

Filed August 6, 2009

Before: Diarmuid F. O'Scannlain, Pamela Ann Rymer, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Kleinfeld

**COUNSEL**

Michelle Hansen, Suquamish Tribe, Office of Tribal Attorney, Suquamish, Washington, for the appellant.

Harold Chesnin, Office of the Tribal Attorney, Seattle, Washington, and Andrew H. Salter (briefed), Salter Joyce Ziker, PLLC, for appellee Upper Skagit Indian Tribe.

James M. Jannetta, Office of Tribal Attorney, LaConnor, Washington, for appellee Swinomish Indian Tribal Community.

Lauren P. Rasmussen (briefed), Law Offices of Lauren P. Rasmussen, Seattle, Washington, for appellees Port Gamble S'Klallam and Jamestown S'Klallam Tribes.

Mason D. Morisset (briefed), Morisset, Schlosser, Jozwiak & McGaw, Seattle, Washington, for appellee The Tulalip Tribes.

---

## OPINION

KLEINFELD, Circuit Judge:

This case concerns the geographical scope of the Suquamish Indian Tribe's treaty right fishing grounds in the Puget Sound.

### I. Background.

In 1850s, the United States signed a series of treaties with the tribes[1] of the Pacific Northwest.[2] In the treaties, "[t]he Tribes ceded their aboriginal lands to the United States for settlement, receiving in exchange exclusive title to defined lands, free medical care, schools, occupational training, and annuity payments."[3]

---

[1]*See United States v. Washington*, 384 F. Supp. 312, 355 (W.D. Wash. 1974) ("No formal political structure had been created by the Indians living in the Puget Sound area at the time of initial contact with the United States Government. Governor Stevens . . . deliberately created political entities for purposes of delegating responsibilities and negotiating treaties. In creating these entities Governor Stevens named many chiefs and sub-chiefs.") [hereinafter *Decision I*].

[2]*See, e.g.*, Treaty of Point No Point (Jan. 26, 1855), 12 Stat. 933 (1859); Treaty of Point Elliott (Jan. 22, 1855), 12 Stat. 927 (1859). *See generally Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661-69 (1979).

[3]*United States v. Washington*, 157 F.3d 630, 638 (9th Cir. 1998). For a general overview of the history of the treaties and the ensuing fishing rights litigation, see *id.* at 638-41.

The treaties also reserved to the Tribes the "right of taking fish at usual and accustomed grounds and stations . . . ."[4] The term "usual and accustomed grounds and stations" includes "every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters."[5]

In 1970, the United States initiated the underlying case, *United States v. Washington*, against the State of Washington in order to vindicate the tribes' treaty right to fish. As part of his lengthy and detailed opinions, Judge Boldt determined the various tribes' usual and accustomed fishing grounds and stations.[6] He stated that he was particularly aided in his determinations by the "authoritative and reliable summaries of relevant aspects of Indian life" prepared by Dr. Barbara Lane.[7]

As relevant to this case, Judge Boldt determined that:

> The usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River and including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.[8]

This conclusion was based on Dr. Lane's report. Her report indicated that the Suquamish customarily fished at the mouths

---

[4]Treaty of Point Elliott, 12 Stat. at 928.

[5]*Decision I*, 384 F. Supp. at 332.

[6]*Id.* at 359-82; *see also United States v. Washington*, 459 F. Supp. 1020, 1049, 1059-60 (W.D. Wash. 1978) [hereinafter *Decision II*].

[7]*Decision I*, 384 F. Supp. at 350; *see also United States v. Suquamish Indian Tribe*, 901 F.2d 772, 777 & n.13 (9th Cir. 1990) (noting Judge Boldt's reliance on Dr. Lane).

[8]*Decision II*, 459 F. Supp. at 1049.

of the Duwamish and Snohomish Rivers[9] in the fall and winter, and in wider areas in the spring and summer. She also noted that an October 1827 journal entry indicated that the Suquamish had traveled all the way north to the Fraser River and Fort Langley in what is now British Columbia.[10] Dr. Lane reported that "the Suquamish regularly travelled through the San Juan Islands and to the Fraser river . . . . It is likely that one of the reasons for travel was to harvest fish."

Almost thirty years after Judge Boldt reviewed Dr. Lane's report and made the initial determination of Suquamish's territory, the tribe changed its fishing patterns to include Saratoga Passage and Skagit Bay. The Upper Skagit Tribe then initiated this case by filing a request for determination[11] that the Suquamish were fishing outside of their adjudicated grounds. Both Upper Skagit and Suquamish moved for summary judgment. The relevant facts are undisputed and set forth above; the parties only dispute the inferences to be drawn from those facts.

The district court granted summary judgment to Upper Skagit, finding that it had met its burden of demonstrating that Judge Boldt did not intend to include these areas in Suquamish's traditional fishing grounds. The court reached this conclusion even though it held that Judge Boldt used the term Puget Sound unambiguously to refer to all the marine areas inward from the mouth of the Strait of Juan de Fuca. Suquamish timely appeals.

---

[9]Both rivers are on the east side of the Puget Sound. The Duwamish empties into Elliott Bay near Seattle. The Snohomish empties into Port Gardner Bay near Everett.

[10]The Fraser River empties into the Strait of Georgia near Vancouver.

[11]Requests for determination are similar to a complaint. They are the mechanism by which a party may invoke the continuing jurisdiction of the court in *United States v. Washington*. *See Decision I*, 384 F. Supp. at 419. Such requests begin new subproceedings in the original case. The judgment at the end of subproceedings are final judgments appealable under 28 U.S.C. § 1291.

## II. Analysis.

We review summary judgment de novo, viewing the evidence and all reasonable inferences in the light most favorable to the non-moving party.[12] Circuit precedent dictates that our task is to determine whether Judge Boldt intended the Suquamish to have treaty fishing rights in Saratoga Passage and Skagit Bay, rather than rely on his words alone.[13]

### A. Ambiguity.

**[1]** Suquamish argues that the court should only clarify Judge Boldt's rulings after finding them ambiguous. This contention is foreclosed by our precedent. "[A]n analysis of the decision is necessary, *whether the text is unambiguous or not*, in order to understand [findings] 'in light of the facts of the case.' "[14] Ambiguity thus is not a prerequisite for clarifying the geographical scope of tribal fishing grounds. Nor, however, is it irrelevant. Instead, it "is certainly a factor to be considered" in determining Judge Boldt's intent.[15] We have previously held Judge Boldt's use of the term Puget Sound to be ambiguous.[16] But the question in this case is not whether Judge Boldt generally used Puget Sound ambiguously. The question is whether he intended this specific use of Puget Sound to include Saratoga Passage and Skagit Bay. He did.

---

[12]*Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007).

[13]*Muckleshoot Indian Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1359 (9th Cir. 1998) [hereinafter *Muckleshoot I*].

[14]*United States v. Muckleshoot Indian Tribe*, 235 F.3d 429, 433 (9th Cir. 2000) (emphasis added) [hereinafter *Muckleshoot III*]. *See also Muckleshoot I*, 141 F.3d 1359 ("Swinomish offered no evidence that suggests that FF 6 is ambiguous *or* that the court intended something other than its apparent meaning when it rendered *Decision I*.") (emphasis added).

[15]*Muckleshoot III*, 235 F.3d at 433.

[16]*Id.*; *see also United States v. Lummi Indian Tribe*, 235 F.3d 443, 451-52 (9th Cir. 2000).

**[2]** Judge Boldt used the term Puget Sound broadly. He defined it as including the Strait of Juan de Fuca and all salt-water areas inland. But Judge Boldt's use of Puget Sound is ambiguous with regard to the Hood Canal and the Straits of Georgia and Juan de Fuca — waters at its edges.[17] Judge Boldt had described Puget Sound as distinct from those water-ways. Upper Skagit did not and cannot, however, point to an instance where Judge Boldt used Puget Sound in a way that excluded Saratoga Passage and Skagit Bay, waters at its center.

**[3]** The district court correctly concluded that "in every instance in 1975 where Judge Boldt did state a definition for Puget Sound, it is a broad one which necessarily includes both Saratoga Passage and Skagit Bay." This clear meaning must be taken into account in determining Judge Boldt's intent.[18]

B.   Burden of proof.

Summary judgment is appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[19] Determining who bears what burden of proof is key to deciding this appeal.

**[4]** At issue in an original territorial determination is whether there is sufficient evidence to show that disputed waters were part of a tribe's usual and accustomed grounds.[20] The tribe claiming territory bears the burden of proof.[21] At issue in a proceeding to clarify a previous territorial determination is what Judge Boldt intended by his description of a

---

[17]*Lummi Indian Tribe*, 235 F.3d at 451-52.

[18]*Muckleshoot III*, 235 F.3d at 433.

[19]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[20]*United States v. Lummi Indian Tribe*, 841 F.2d 317, 318 (9th Cir. 1988).

[21]*Id.*

tribe's territory.[22] The tribe claiming Judge Boldt intended something other than his apparent meaning bears the burden of proof.[23]

[5] The burden of proof is especially important given the evidence relevant to the clarification proceeding. We have held that the relevant facts are the "evidence that was put before Judge Boldt."[24] In other words, "the palpable facts are substantially undisputed."[25] It is only the inferences that can be drawn from those facts which are disputed. If the evidence before Judge Boldt equally supports contradictory inferences about his intent, the party challenging the apparent meaning of his original determination cannot meet its burden of proof.[26]

C.   Merits.

Suquamish's adjudicated usual and accustomed grounds include "the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River."[27] Saratoga Passage and Skagit Bay are in the Puget Sound between these two points. Upper Skagit therefore has the burden of proving that Judge Boldt intended not to include these waters, contrary to the apparent meaning of his words.

Suquamish has little evidence of a traditional presence in these two specific locations. The district court erred in finding that lack of evidence fatal, rather that putting the burden of proof on Upper Skagit and viewing the inferences from the

---

[22]*Muckleshoot III*, 235 F.3d at 433.

[23]*Muckleshoot I*, 141 F.3d at 1358-59.

[24]*United States v. Lummi Indian Tribe*, 235 F.3d 443, 450 (9th Cir. 2000).

[25]*Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985).

[26]*Lummi Indian Tribe*, 235 F.3d at 452 ("This argument fails because . . . it is *just as likely* that this area was intended to be included as that it was not.") (emphasis added).

[27]*Decision II*, 459 F. Supp. at 1049.

evidence in the light most favorable to Suquamish. The district court also made factual errors in reaching its judgment. When all reasonable inferences are drawn in favor of Suquamish, it is at least as likely as not that Judge Boldt intended to include Saratoga Passage and Skagit Bay in the tribe's territory. Summary judgment therefore should be awarded to Suquamish because Upper Skagit cannot meet its burden of proof on undisputed facts.[28]

### i. *Factual errors.*

The district court emphasized that Dr. Lane's testimony did not refer to Area 4 on a map attached to proposed fishing regulations discussed during the 1975 proceeding. It also stated that the "fall and winter fishery [at the mouth of the Snohomish River] was described by Dr. Lane as separate and distinct from the spring and summer travels up to the Fraser River." These conclusions are mistaken.

[6] Dr. Lane's testimony did refer to Area 4. The Suquamish live in Area 4. She testified that the map at page 22 of her report, documenting sites within Suquamish territory where they were accustomed to fishing, depicted locations south of Areas 1 and 2. The only location south of Areas 1 and 2 on the map is Area 4. This error is important because Saratoga Passage and Skagit Bay are in Area 4. The district court relied on the purported lack of testimony regarding Area 4 to conclude that Judge Boldt did not intend to include those locations in Suquamish's territory.

[7] Dr. Lane also did not separate the fishing at the mouth of the Snohomish from the trips to the Fraser River by limiting the latter to the spring or summer. The evidence she relied on shows that the Suquamish were at Fort Langley in *October* of 1827. In other words, they visited the Fraser River area in

---

[28]*See Braxton-Secret*, 769 F.2d at 531 (holding that summary judgement on intent is permissible if the facts are undisputed).

the fall as well as in the spring and summer.[29] Additionally, it is reasonable to infer that the Suquamish would return from a fall trip to the Fraser River by stopping at the mouth of the Snohomish River to gather fish because they would not be able to gather enough on the west side of the Sound upon their return.[30]

**[8]** This error is important because the natural route from the mouth of the Snohomish River (where Dr. Lane reported that the Suquamish were accustomed to fishing), through the Rosario Strait (where Judge Boldt recognized a Suquamish usual and accustomed fishing ground), to the Fraser River (another Suquamish usual and accustomed fishing ground) goes directly through Saratoga Passage and Skagit Bay.[31] Thus, the facts before Judge Boldt make it at least as likely as not that he intended to include Saratoga Passage and Skagit Bay in Suquamish's treaty fishing grounds.

### ii. Inferences favoring Suquamish.

**[9]** Both the language that Judge Boldt used and the evidence before him, specifically the Lane Report, support an inference that he intended to include the disputed areas in

---

[29]Dr. Lane testified that a trip from Port Madison to the San Juans would take one day. It would be no more than another day from the San Juans to the Fraser River and Fort Langley. The testimony before Judge Boldt supports the conclusion that the entire trip would take two days. Judge Craig heard different evidence in 1983. *See United States v. Washington*, 626 F. Supp. 1405, 1529 (W.D. Wash. 1985) (noting Dr. Lane's testimony that *a round trip* from the mouth of the Snohomish River to the Fraser River would have taken two to four weeks). The difference is immaterial, because a trip that arrived in October would still begin and end in fall and because Judge Boldt's intent in 1975 controls.

[30]Dr. Lane's report and testimony show that the Suquamish were dependent on fishing on the east side of the Puget Sound in the fall and winter.

[31]*Cf. Lummi Indian Tribe*, 235 F.3d at 452 ("If one starts at the mouth of the Fraser River . . . and travels past Orcas and San Juan Islands . . . it is natural to proceed through Admiralty Inlet . . . .").

Suquamish's territory. The language Judge Boldt used to describe Suquamish territory is different from that he used to describe the territory of most tribes. Judge Boldt routinely provided specific geographical definitions as to their boundaries, and specifically identified bays, straits, and island areas that he intended to include. Judge Boldt did not do so in Suquamish's determination. He included the entire Puget Sound from Vashon Island to the Fraser River. That Judge Boldt did not follow his pattern and delimit Suquamish's boundaries suggests that he intended the boundaries not to be limited.

We are aware of two other territorial determinations in which Judge Boldt used the term Puget Sound without tying it to some geographical anchor — the territory of the Muckleshoot[32] and the Lummi[33] tribes. In the case of both tribes, however, Judge Boldt did use some limiting language — either "secondarily" or "Northern," respectively. We have heard appeals regarding both of these determinations. In the case of the Muckleshoot, we determined that the evidence before Judge Boldt demonstrated that the phrase "secondarily in the saltwater of the Puget Sound" was limited to the saltwater immediately adjacent to Muckleshoot's freshwater fishery.[34] In the case of the Lummi, we determined that the "Northern Puget Sound" included the west side of Whidbey Island in the absence of evidence to the contrary.[35] We did find that "Northern Puget Sound" excluded the Strait of Juan de Fuca

---

[32]*Decision I*, 384 F. Supp. at 367 ("Muckleshoot Indians had usual and accustomed fishing places primarily at locations on the upper Puyallup, the Carbon, Struck, White, Green, Cedar and Black rivers . . . and *secondarily* in the saltwater of Puget Sound.") (emphasis added).

[33]*Id.* at 360 ("[T]he usual and accustomed fishing places of the Lummi Indans at treaty times included the marine areas of the *Northern* Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay.") (emphasis added).

[34]*Muckleshoot III*, 235 F.3d at 434-35.

[35]*Lummi Indian Tribe*, 235 F.3d at 452.

and the Hood Canal because Judge Boldt had used those terms as distinct from Puget Sound elsewhere in his decision.[36] Upper Skagit must show a similar implied limitation.

Upper Skagit notes that Possession Sound was not specifically included in the determination of Suquamish's territory, even though it was in the case of the Tulalip tribe. This silence, however, does not support an inference against Suquamish. It is unquestioned that the Suquamish have a right to fish in Useless Bay, on the west side of Whidbey Island, even though that Bay is not specifically listed in Suquamish's territory and is in Tulalip's. Additionally, Possession Sound lies immediately adjacent to the mouth of the Snohomish River, and was thus described as a traditional Suquamish fishing location in Dr. Lane's report.

[10] Upper Skagit also emphasizes the fact that Suquamish's territory does not include an eastern border. We need not decide whether this argument is correct.[37] Determining whether Judge Boldt intended to include specific marine waters within the Suquamish's territory calls for a case by case examination of the facts to determine whether Judge Boldt "intended something other than [his] apparent meaning."[38] We conclude that it is at least as likely as not that Judge Boldt intended to include Saratoga Passage and Skagit Bay because he had elsewhere identified those waters as being within "the marine waters of the Puget Sound,"[39] and because they lie on the natural route between two traditional Suquamish fisheries.

---

[36]*Id.* at 451-52.

[37]One plausible border of "the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River" is the land bordering the marine waters.

[38]*Muckleshoot I*, 141 F.3d at 1359.

[39]*See Decision II*, 459 F. Supp. at 1049 ¶ 6 ("The usual and accustomed fishing places of the Swinomish Tribal Community include . . . the marine areas of the northern Puget Sound from the Fraser River south to and including Whidbey, Camano, Fidalgo, Guemes, Samish, Cypress and the

**[11]** Upper Skagit's third contention is that *United States v. Suquamish Indian Tribe*[40] controls this case. In *Suquamish Indian Tribe*, Suquamish attempted to exercise fishing rights on the freshwater river systems to the "*east of* the Puget Sound" as the successor in interest to the Duwamish tribe.[41] We held that the Suquamish had "usual and accustomed fishing places in several areas in the west side of Puget Sound" and were "not entitled to exercise fishing rights on the east side of Puget Sound."[42] Such language, however, "must be read in the light of the facts before [the court]."[43] The court in *Suquamish Indian Tribe* was only confronted with question of whether the Suquamish were successors in interest to the Duwamish.[44] The Suquamish had abandoned any independent claim arising out of its own treaty time practices to the waters at issue, so our decision necessarily did not address the question of whether the Suquamish had an independent entitlement to fish there. Additionally, because *Suquamish Indian Tribe* dealt with the rights of the Suquamish to fish in freshwater river systems to the "*east of* the Puget Sound," the decision does not speak to whether the Suquamish have fishing rights in Saratoga Passage or Skagit Bay, waters *within* the Puget Sound.

**[12]** Finally, Upper Skagit argues that Dr. Lane's report on

---

San Juan Islands, and including Bellingham Bay and Hale Passage adjacent to Lummi Island."). It is unquestioned that Saratoga Passage and Skagit Bay are within these marine areas "includ[ed]" within the "northern Puget Sound." *See also id.* at 1059 (including Saratoga Passage in the "usual and accustomed *marine* fishing areas of the Tulalip Tribes of Washington") (emphasis added).

[40]901 F.2d 772 (9th Cir. 1990).

[41]*Id.* at 774 & n.2, 775 (9th Cir. 1990) (emphasis added).

[42]*Id.* at 774, 778.

[43]*Muckleshoot III*, 235 F.3d at 433 (quoting *Julian Petroleum Corp. v. Courtney Petroleum Co.*, 22 F.2d 360, 362 (9th Cir. 1927)).

[44]*Suquamish Indian Tribe*, 901 F.2d at 775.

the Swinomish supports the conclusion that Judge Boldt intended to exclude Saratoga Passage and Skagit Bay from Suquamish's territory. They base this argument on the fact that Dr. Lane said that certain constricted waterways bordering Saratoga Passage and Skagit Bay were controlled by the Swinomish. This argument is without merit. The fact that one tribe controls a territory does not imply the absence of fishing there by another tribe.[45] Indeed, the Suquamish have a treaty reserved fishing right in the Hood Canal, a territory controlled by the Skokomish.[46]

[13] We conclude that it is at least as likely as not that Judge Boldt meant what he said; the Suquamish treaty territory "include[s] the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River." This broad, unlimited fishery is what Dr. Lane described in her report and testimony. Dr. Lane stated that marine fisheries "are far more difficult to delimit than fresh waters." She repeatedly underlined that her report did not, and could not, list all of the usual and accustomed fishing locations of the Suquamish. She noted that the Suquamish had more limited resources in their home area than most tribes, and thus had to travel more extensively to fish.

[14] Dr. Lane said that she had no documentary evidence that the Suquamish fished in the San Juan Islands, but nonetheless found it likely that they did so. Judge Boldt agreed, deciding in the absence of any specific evidence that the Haro and Rosario Straits were part of the Suquamish traditional fishing grounds. This demonstrates a lack of specific evidence

---

[45]*See Decision I*, 384 F. Supp. at 332 (defining "usual and accustomed" as including locations "whether or not other tribes then also fished in the same waters"); *cf. United States v. Skokomish Indian Tribe*, 764 F.2d 670, 672 (9th Cir. 1985) (holding that a primary right claim could be litigated separately from a territorial determination).

[46]*See Decision III*, 626 F. Supp. at 1491; *see also Decision II*, 459 F. Supp. at 1049 ¶ 7 (recognizing the Swinomish's right to fish in Hale Passage, a territory controlled by the Lummi).

would not have precluded Judge Boldt from including Skagit Bay and Saratoga Passage in Suquamish's territory.

### III.   Conclusion.

We are obligated to discern what a deceased federal district judge intended when he adjudicated Suquamish's fishing grounds more than three decades ago. And that district judge attempted to determine the location of the tribe's fishing grounds more than three quarters of a century earlier, despite the paucity of any very reliable evidence. Thus we are compelled to make legal determinations based on grossly inadequate foundations. But for now there seems to be no preferable alternative. We therefore **REVERSE** the judgment of the district court and **REMAND** for the entry of summary judgment in favor of Suquamish. All pending motions are dismissed as moot.