375 F.3d 861
 DISABLED RIGHTS ACTION COMMITTEE, Plaintiff-Appellant,
v.
LAS VEGAS EVENTS, INC.; University of Nevada, Las Vegas, Thomas and Mack Center; Professional Rodeo Cowboys Association, Defendants-Appellees.
 No. 02-17163.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 5, 2003.
 Filed July 13, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Richard F. Armknecht, III, Armknecht & Cowdell, P.C., Lindon, UT, for the plaintiff-appellant.
 Elayna J. Youchah, Schreck Brignone, Las Vegas, NV; Walter L. Ayers, University and Community College System of Nevada, Las Vegas, NV; and Elizabeth R. Brennan, Lionel Sawyer & Collins, Las Vegas, NV, for the defendants-appellees.
 Appeal from the United States District Court for the District of Nevada; Howard D. McKibben, District Judge, Presiding, D.C. No. CV-00-01170-HDM.
 Before HAWKINS, PAEZ, and BERZON, Circuit Judges.
 BERZON, Circuit Judge.
 
 
 1
 The central question in this Americans with Disabilities Act (ADA) suit is whether the two private entities that stage the National Finals Rodeo at a publicly-owned arena in Las Vegas "operate" the arena during the Rodeo, and so are responsible for assuring compliance with the ADA's public accommodation physical accessibility requirements. The district court thought not. Also at issue is whether the suit can proceed without the participation of the University and Community College System of Nevada (University System), the owner of the arena. The district court ruled that under Rule 19 of the Federal Rules of Civil Procedure, it cannot.
 
 
 2
 We conclude that under the circumstances here, the private groups staging the Rodeo did "operate" the publicly-owned facility during the Rodeo and so can be sued under Title III of the ADA for failure to make a place of public accommodation accessible for disabled individuals. We further conclude that University System is not a necessary party under Rule 19.
 
 I. BACKGROUND
 A. Factual History
 
 3
 Disabled Rights Action Committee (Disabled Rights) is a non-profit organization that advocates for the rights of people with disabilities. Its 1000-plus members include residents of Las Vegas, Nevada, who use wheelchairs and attend or wish to attend events, including the Rodeo, at the Thomas & Mack Center (Center) in that city.
 
 
 4
 The Rodeo is an annual competition sponsored by the Professional Rodeo Cowboys Association (Cowboys) and presented by Las Vegas Events (Events). University System, a sub-entity of the state of Nevada, owns the Center on behalf of the University of Nevada, Las Vegas (UNLV). Events entered into a "License Agreement" with University System granting it permission to use the Center to conduct the Rodeo in November and December each year.[1]
 
 The License Agreement provides:
 
 5
 All cleaning of public spaces, equipment use, and services requested or required beyond normal operation and maintenance of the Licensed Space and not specifically provided for in this Agreement shall be at the expense of the Licensee. This shall include, but not be limited to, special seating change-overs, erection of stages and platforms, decorations, sound and lighting installations, and any other special services requested or required by the Licensee.[2]
 
 
 6
 Disabled Rights filed suit under Title III of the ADA, naming Events and Cowboys as defendants. Title III of the ADA, entitled "Public Accommodations and Services Operated by Private Entities," provides that
 
 
 7
 No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.
 
 
 8
 42 U.S.C. § 12182(a). The statute further provides that, inter alia, "a motion picture house, theater, concert hall, stadium, [and] other place of exhibition or entertainment" are "private entities [ ] considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce." 42 U.S.C. § 12181(7)(C).
 
 
 9
 The complaint alleged that Disabled Rights' members "have been subjected [at the Center] to discriminatory access, substandard seating arrangements, and higher ticket prices" than those paid by nondisabled persons.[3] Disabled Rights also alleged that Events and Cowboys "operate" the Center during each Rodeo. Disabled Rights sought an injunction preventing Events and Cowboys from "operating the Thomas & Mack Center unless and until such facility is fully compliant with the ADA."[4]
 
 B. Procedural History
 
 10
 From this relatively straightforward complaint sprung a procedural morass in the district court that is somewhat difficult to untangle.
 
 
 11
 1. Joinder of UNLV as an Indispensable Party
 
 
 12
 Early in the litigation, Events moved pursuant to Federal Rule of Civil Procedure 19 for joinder of the UNLV Thomas and Mack Center. The district court granted the motion in February 2001, ordering Disabled Rights to file an amended complaint naming "the University of Nevada, Las Vegas, Thomas & Mack Center" as a defendant.
 
 
 13
 Applying the multi-factor test for joinder, the district court reasoned that because it is the entity that owns and operates the Center in the most "direct sense," UNLV has a legally protected interest in the outcome of the litigation. The court also concluded that (1) absent UNLV, complete relief among the existing parties was not possible, as enforcement of any judgment awarding relief would require the cooperation of UNLV, as the owner and operator of the Center; and (2) the relief could not be shaped in any way to lessen the prejudice to UNLV if it did not participate in the litigation. The district court directed Disabled Rights to join "the University of Nevada, Las Vegas, Thomas & Mack Center."[5]
 
 
 14
 On July 17, 2001, Disabled Rights filed a first amended complaint, this time naming Cowboys, Events, and the UNLV Center as defendants, but still alleging violations only of Title III of the ADA.
 
 
 15
 2. Dismissal of Action Against Events, Stay of Dismissal, and Vacatur of Stay
 
 
 16
 Events then moved for judgment on the pleadings, contending that because the Center is owned by a public entity, it is not a "place of public accommodation" within the meaning of Title III of the ADA. On October 1, 2001, the district court agreed, reasoning: "The venue chosen by [Events] is owned by the State of Nevada, and, therefore is not a facility that's a public accommodation. The term, `public accommodation,' encompasses only private entities."
 
 
 17
 At the time the court ruled on Events' motion to dismiss on the merits, however, the UNLV Center had not yet been served with the first amended complaint. In granting the motion, the court stated:
 
 
 18
 [T]here is still before this Court ... the University of Nevada, Las Vegas, is a — is before the Court having been joined as what the Court concludes was a necessary party.... [T]he Motion to Dismiss filed by [Events] is granted, and this action is dismissed as to [Events]. It is so ordered. This will constitute findings and conclusions of the Court.
 
 
 19
 The district court then suggested that Disabled Rights consider entering into a stipulation dismissing the action against Cowboys on the same grounds as those raised by Events. The court explained, "[I]f you can work out the language, [a stipulation] will be fine with me, which in effect, I guess, would end up dismissing this case, but preserving your right to appeal as to the parties involved."
 
 
 20
 Later that day, after the hearing was over, the court, sua sponte, stayed its order granting Events' motion to dismiss. A second hearing was held on October 5, 2001, to again consider the appropriate disposition of Events' motion. This time, the court, after expressing uncertainty as to the proper resolution and hearing further argument, discussed the status of UNLV's participation in the case:
 
 
 21
 THE COURT: [T]he University has been joined as a necessary party, I concluded that that was the case here, they're still in this action, but I take it what, they haven't been served or something?
 
 
 22
 MR. ARMKNECHT: They haven't been served, your honor. I still have about forty more days to do that, but —
 
 
 23
 THE COURT: But I take it you're not going to do that? This is an unusual situation.
 
 
 24
 MR. ARMKNECHT: I'll serve them, your honor, I just, you know, if it's going to be dismissed, I guess I'll serve them anyway, I'll serve them, but I'm not going to bring them in for Title II purposes....
 
 
 25
 THE COURT: You're not going to, you're not going to be successful against them under Title III.
 
 
 26
 The district court then vacated the stay of its October 1 order dismissing the action against Events, thereby reinstating the dismissal order.
 
 
 27
 3. Stipulated Dismissal of Action Against Cowboys
 
 
 28
 Next, following the district court's suggestion, Disabled Rights and Cowboys stipulated to dismissal of the action against Cowboys. Pursuant to the stipulation, the district court dismissed Cowboys from the action. The stipulation provided that the "Court's entry of the Order of dismissal shall constitute an order which may be appealed ... as though the Order related to a contested, and not a stipulated matter."
 
 
 29
 4. Dismissal of Events, Cowboys, and University System, and Entry of Judgment
 
 
 30
 On March 28, 2002, Disabled Rights filed a Second Amended Complaint replacing the UNLV Center with University System, leaving Events and Cowboys as defendants, and raising no new causes of action.[6]
 
 
 31
 University System, having been served, moved to dismiss for lack of subject matter jurisdiction. The argument was that as a public entity, University System could not be sued under Title III. Events and Cowboys also moved to dismiss the complaint, arguing that the court's earlier orders dismissing the action against each of them precluded Disabled Rights from naming them as defendants in the second complaint.
 
 
 32
 The district court granted all three motions to dismiss, holding that (1) the law of the case doctrine barred re-alleging claims against Events and Cowboys identical to those earlier dismissed; and (2) "[a]s an entity of the State of Nevada, Defendant University System cannot be sued under Title III of the ADA."
 
 
 33
 On September 27, 2002, the district court entered judgment against Disabled Rights and in favor of all defendants. This appeal followed.
 
 II. JURISDICTION
 
 34
 The first question we face arises from the tangled procedural history just recited: Do we have jurisdiction over the entirety of Disabled Rights' appeal, or was the notice of appeal filed too late with respect to the dismissal of Events and Cowboys from the suit?
 
 
 35
 The filing of an effective notice of appeal is a nonwaivable jurisdictional requirement. See Miller v. Marriott Int'l, Inc., 300 F.3d 1061, 1063 (9th Cir.2002). A notice of appeal must be filed within 30 days after the entering of the final judgment or order from which appeal is taken, absent an applicable exception. See FED. R. APP. P. 4.
 
 
 36
 Events and Cowboys contend that with the district court's order of November 2001 dismissing the action against Cowboys, there was an appealable final judgment, and that Disabled Rights can no longer appeal that judgment. At the time the stipulated order dismissing the suit as against Cowboys was entered, the two original defendants note, there was no other served party, although the UNLV Thomas & Mack Center had been named in the first amended complaint. So, at that juncture, every served party had been dismissed from the suit. As a result, contend Events and Cowboys, Disabled Rights must limit its appeal to the matters addressed by the district court's September 27, 2002 order, the only order as to which Disabled Rights filed a timely notice of appeal.
 
 
 37
 We do not agree. The federal courts of appeals are empowered to hear "appeals from all final decisions of the district courts." 28 U.S.C. § 1291. "A final decision is one that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." United States v. Lummi Indian Tribe, 235 F.3d 443, 448 (9th Cir.2000) (quoting Does v. Advanced Textile Corp., 214 F.3d 1058, 1065-66 (9th Cir.2000)) (internal quotation marks omitted). A decision is "final" within the meaning of § 1291 if it "(1) is a full adjudication of the issues, and (2) clearly evidences the judge's intention that it be the court's final act in the matter." Casey v. Albertson's Inc., 362 F.3d 1254, 1258 (9th Cir.2004) (quoting Nat'l Distrib. Agency v. Nationwide Mut. Ins. Co., 117 F.3d 432, 433 (9th Cir.1997)). The critical question is whether the 2001 dismissal orders were "final" in this sense.
 
 
 38
 Although one might think otherwise, we have recognized that an order granting a motion to dismiss is not necessarily immediately appealable. See Nat'l Distrib. Agency, 117 F.3d at 433. Instead, "the finality requirement must be given a practical rather than a technical construction." Montes v. United States, 37 F.3d 1347, 1350 (9th Cir.1994). We "look[ ] beyond the dismissal order and read the entire record to determine what effect the court intended its order to have." Nat'l Distrib. Agency, 117 F.3d at 433-34; see also Montes, 37 F.3d at 1350 ("In determining whether the district court's ruling was a final, appealable order, we focus on what effect the court intended it to have, rather than the label placed upon it."); Campbell Indus., Inc. v. Offshore Logistics Int'l, Inc., 816 F.2d 1401, 1404 (9th Cir.1987) ("Only when a judge acts in a manner which clearly indicates an intention that the act be final, and a notation of that act has been entered on the docket, does the time for appeal begin to run.").
 
 
 39
 In determining the district court's intent, we have "traditionally drawn a distinction between the dismissal of the complaint and the dismissal of the underlying action." Montes, 37 F.3d at 1350. While the dismissal of a complaint "is ordinarily not appealable unless the circumstances clearly indicate that the court determined that the complaint could not be saved by amendment[,] ... [d]ismissal of an action ... is final and appealable." Id. (internal citation omitted).
 
 
 40
 In Montes, for example, after the district court granted the United States' motion to dismiss the complaint and action without prejudice, the court signed an order permitting the plaintiff to file an amended complaint. See id. at 1349. Montes subsequently filed an amended complaint which was nearly identical to the first one. Because the complaint raised no new issues, the United States successfully moved to dismiss the amended complaint and underlying action based on the law of the case doctrine. Montes then filed a notice of appeal, within 30 days of the second order of dismissal but not the first. As in this case, on appeal the plaintiff challenged the substantive rulings contested in the first dismissal, not the district court's application of the law of the case doctrine. We concluded that the district court's decision to enter an order permitting the plaintiff to file an amended complaint after entering the order of dismissal demonstrated that the first dismissal was not intended to be a final and appealable order. See id. at 1351.
 
 
 41
 Here, the entire course of events suggests that the 2001 dismissal orders were not intended finally to dispose of the whole case. First, and "[m]ost importantly," no final judgment was entered after the initial dismissal orders. Lummi Indian Tribe, 235 F.3d at 448 (holding that district court's summary judgment order, which left no issues to be resolved, was not final where no final judgment was entered, and the parties continued to litigate after the plaintiff filed an amended pleading); see also FED. R. CIV. P. 58(a)(1) ("Every judgment and amended judgment must be set forth on a separate document . . . ."); Nat'l Distrib. Agency, 117 F.3d at 434 ("Had the court entered a separate final judgment subsequent to the dismissal order, we would be confident that the court intended no further action in the case"). But cf. Casey, 362 F.3d at 1259 (holding that a party had waived the Rule 58 requirement that a separate judgment be filed by filing a Rule 60(b) motion for relief from judgment, thus indicating her belief that a final judgment had been entered).
 
 
 42
 Second, during the October 5 hearing in which the district court reconsidered the Events dismissal order, the court appeared to assume that even after the case was dismissed as to the other defendants, Disabled Rights was free to serve the UNLV Center if it wished to do so. Indeed, the district court inquired whether Disabled Rights intended to serve UNLV; counsel for Disabled Rights answered that it did. See Montes, 37 F.3d at 1351 (concluding that prior dismissal order was not intended to be final where the district court had suggested during the dismissal hearing that the plaintiff should "feel free" to come up with a new approach); see also WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136-37 (9th Cir.1997) (en banc) (holding that where the district court has granted leave to amend, the order is not final and "a further step must be taken to fix an unequivocal terminal date for appealability, and to avoid the hazards of confusion or misunderstanding as to the time for appeal") (internal quotation marks and citation omitted).
 
 
 43
 Third, after the action had been dismissed as to both Events and Cowboys, the district court granted Disabled Rights' motion to modify its previous order as to the joinder of UNLV and amended the order to refer not to UNLV but to "the indispensable party." Had the district court intended the dismissal of Cowboys to be its "final act in the matter," Casey, 362 F.3d at 1258 (quoting Nat'l Distrib. Agency, 117 F.3d at 433), it would have denied the motion to modify as moot. Instead, the granting of the motion suggests an intent that Disabled Rights be permitted to serve and file a complaint against the so-called "indispensable party," University System.
 
 
 44
 The November dismissal order, in short, was not one that "[left] nothing for the court to do but execute the judgment." Lummi Indian Tribe, 235 F.3d at 448 (quoting Does, 214 F.3d at 1066). That order therefore did not result in a "final" judgment.
 
 
 45
 Events nonetheless contends that the stipulated dismissal was a final judgment, because a decision is final upon the dismissal of all the defendants who have been served, and UNLV or University System had not yet been served at that time. Patchick v. Kensington Publishing Corp. held that
 
 
 46
 If an action is dismissed as to all of the defendants who have been served and only unserved defendants remain, the district court's order may be considered final under Section 1291 for the purpose of perfecting an appeal.... In such circumstances there is no reason to assume that there will be any further adjudication of the action.
 
 
 47
 743 F.2d 675, 677 (9th Cir.1984) (emphasis added and internal citations omitted). Here, however, it was not clear from the dismissal of the complaint that the action itself had been dismissed. Further, the record here, unlike the situation in Patchick, establishes that there was reason to assume that there might be further adjudication of the action. Even where a complaint has been dismissed as to all the served defendants, Montes and other similar cases preclude finality where no final judgment is entered and it is clear from the course of proceedings that further adjudication is contemplated.
 
 
 48
 In light of the concerns of fairness and clarity that underlie Rule 58's finality requirement, see Lummi Indian Tribe, 235 F.3d at 448-49, we hold that the November dismissal order was not a final, appealable order and that Disabled Rights' notice of appeal from the September 27, 2002 order, the only final judgment entered, was effective to confer appellate jurisdiction.[7]
 
 
 49
 In sum, we have jurisdiction over Disabled Rights' entire appeal.
 
 III. TITLE III
 
 50
 Because an understanding of the reach of Title III informs our inquiry into the kinds of parties that must be joined, if possible, in Title III actions, we first consider the reach of that statutory provision as applied to the circumstances in this case. The pivotal merits questions are: Does Title III cover private entities operating facilities owned by public entities covered by Title III, and, if so, in what circumstances?
 
 A. The Statute's Operative Language
 
 51
 Title III of the ADA, entitled "Public Accommodations and Services Operated by Private Entities," provides that
 
 
 52
 No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.
 
 
 53
 42 U.S.C. § 12182(a). Title III further provides:
 
 
 54
 The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce —
 
 
 55
 ... (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment[.]
 
 
 56
 42 U.S.C. § 12181(7). The term "private entity" is defined as "any entity other than a public entity." 42 U.S.C. § 12181(6). A "public entity" is "any State or local government [or] any department, agency, . . . or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).
 
 
 57
 Title III's main operative provision, § 12182(a), provides that private entities that do not own the facilities they lease or operate have responsibilities under Title III. Section 12182(a) expressly so states, placing responsibility to refrain from discrimination not only on "owners" of places of public accommodation but also on those who "lease[ ]" or "operate[ ]" such places.
 
 
 58
 Further, limiting the reach of the statute to owners of the stadiums (and other kinds of "public accommodation" listed in § 12181(7)) would conflict with 42 U.S.C. § 12182(b), which immediately follows 42 U.S.C. § 12182(a). Section 12182(b)(1)(A)(i) provides:
 
 
 59
 It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.
 
 
 60
 (emphasis added); see also § 12182(b)(1)(A)(ii) (making it "discriminatory" to afford to disabled persons, "through contractual, licensing, or other arrangements," an opportunity to "participate in or benefit from" such goods, services, facilities, and accommodations that is not equal to that afforded to other individuals); § 12182(b)(1)(A)(iii) (making it "discriminatory" to provide to disabled persons, "through contractual, licensing, or other arrangements," a benefit that is "different or separate from" that provided to other individuals).[8] These provisions make clear that private entities otherwise covered by Title III may not avoid their obligations through contract, such as by contracting to provide "goods, services, facilities, privileges, advantages, or accommodations" at venues they do not own.
 
 
 61
 Such evasion would contravene the broad inclusionary purposes of Title III, "to extend the[ ] general prohibitions against discrimination to privately operated public accommodations and to bring individuals with disabilities into the economic and social mainstream of American life." H.R.Rep. No. 101-485(II), at 99 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 382 (emphasis added); see also S.Rep. No. 101-116, at 58 (1989) (same). Congress acted out of concern that "an overwhelming majority of individuals with disabilities lead isolated lives and do not frequent places of public accommodation." H.R.Rep. No. 101-485(II), at 34, 1990 U.S.C.C.A.N. at 316; see also Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir.2004) ("The [ADA] responds to what Congress described as a `compelling need' for a `clear and comprehensive national mandate' to eliminate discrimination against disabled individuals.") (quoting PGA Tour, Inc. v. Martin, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)). In view of this concern, "[i]t is critical to define places of public accommodations to include all places open to the public, not simply restaurants, hotels, and places of entertainment ... because discrimination against people with disabilities is not limited to specific categories of public accommodations." H.R.Rep. No. 101-485(II), at 35, 1990 U.S.C.C.A.N. at 317 (quoting former Senator Lowell Weicker). Making liable those entities responsible for the presentation of a particular event best serves the aim of the ADA, to provide disabled persons with equal access to the activities and events from which they have in the past been excluded.
 
 
 62
 Consistent with these considerations, the Supreme Court has held that a private entity that stages an event for a limited time period at a facility owned by a third party is covered by Title III. In PGA Tour, the Court considered whether the petitioner's four-day golf tours operated on golf courses owned by third parties fall within the coverage of Title III. See 532 U.S. at 665, 121 S.Ct. 1879. The Court reasoned, "[i]t seems apparent, from both the general rule and the comprehensive definition of `public accommodation,' that petitioner's golf tours and their qualifying rounds fit comfortably within the coverage of Title III. . . ." Id. at 677, 121 S.Ct. 1879. PGA Tour then elaborated:
 
 
 63
 The events occur on "golf course[s]," a type of place specifically identified by the Act as a public accommodation. § 12181(7)(L). In addition, at all relevant times, petitioner "leases" and "operates" golf courses to conduct its Q-School and tours. § 12182(a). As a lessor and operator of golf courses, then, petitioner must not discriminate against any "individual" in the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" of those courses. Ibid.
 
 
 64
 Id.[9] The Court's analysis rests on the general principle that, under the statute, a place of public accommodation may be "operated" by entities who do not own the facility and use it for a limited time period only.[10]
 
 
 65
 B. Definition of "Public Accommodation"
 
 
 66
 Events and Cowboys contend, however, that under 42 U.S.C. § 12181(7)(C), the provision elaborating what is meant by "public accommodation," no publicly-owned facility may qualify as such. They propose that § 12181(7)(C) must be read as if it provided that "a stadium is considered a public accommodation if it is a private entity." Because the stadium here is not a private entity, posit the private defendants, it cannot possibly be a "public accommodation."
 
 
 67
 This interpretation ignores the statute's awkward drafting. Stadiums and "other place[s] of exhibition or entertainment," see 42 U.S.C. § 12181(7)(C), are never "entities," private or public. The state of Nevada is a public "entity," that is, "[a]n organization (such as a business or a governmental unit) that has a legal identity apart from its members." BLACK'S LAW DICTIONARY 438 (7th ed.2000). The Center itself, in contrast, is a physical location or facility.[11] To make sense of the statute, there must be some relationship between the private entity and the "place of exhibition or entertainment" to which access is sought. Nothing in 42 U.S.C. § 12181(6), the definitional provision, addresses that relationship. The statute is thus ambiguous as to what effect, if any, public ownership may have on Title III's coverage.
 
 
 68
 A Department of Justice (DOJ) regulation directly addresses this question, providing that a private entity that operates a public accommodation is subject to Title III, even if the location is not privately owned. Title 28 C.F.R. § 36.104 defines "place of public accommodation" to mean "a facility, operated by a private entity, whose operations affect commerce and fall within at least one of the following categories — . . . A motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment." (emphasis added). This regulation provides that operation, regardless of ownership, is the relationship between a private entity and a physical place that renders the entity responsible under Title III. See 28 C.F.R. § 36.104.
 
 
 69
 DOJ has also issued a technical assistance manual, setting out examples of covered public accommodations. Those examples make clear that, under DOJ's interpretation, a public accommodation operated by a private entity leasing space from a public entity is covered by Title III. See Americans with Disabilities Act Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities, § III-1.2000.B (1994 Supp.), available at http:// www.usdoj.gov/crt/ada/taman3up.html [hereinafter "Title III Technical Assistance Manual"].
 
 
 70
 The Title III Technical Assistance Manual provides, for example, the following illustration:
 
 
 71
 If the owner of a building is not covered by the ADA, is it possible for a private tenant to still have title III responsibilities? Yes. The fact that a landlord in a particular case is not covered by the ADA does not necessarily negate title III's coverage of private entities that lease or operate places of public accommodation within the facility.
 
 
 72
 ILLUSTRATION: A Federal Executive agency owns a building in which several spaces are rented to retail stores. Although Federal executive agencies are not covered by the ADA, the private entities that rent and operate the retail stores, which are places of public accommodation, are covered by title III.
 
 
 73
 Title III Technical Assistance Manual, at § III-1.2000.B (1994 Supp.).[12] The guidance provided in the technical assistance manual is an interpretation of the DOJ's regulation, see Botosan v. Paul McNally Realty, 216 F.3d 827, 833 (9th Cir.2000), and, as such, is entitled to significant weight as to the meaning of the regulation. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations.").
 
 
 74
 We defer to the DOJ's reasonable interpretation of the statute, as is proper under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "As the agency directed by Congress to issue implementing regulations, see 42 U.S.C. § 12186(b), to render technical assistance explaining the responsibilities of covered individuals and institutions, § 12206(c), and to enforce Title III in court, § 12188(b), the Department[ of Justice]'s views are entitled to deference." Bragdon v. Abbott, 524 U.S. 624, 646, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (citing Chevron, 467 U.S. at 844, 104 S.Ct. 2778 (1984)). Where "the statute is silent or ambiguous with respect to the specific issue," the court must defer to "the agency's answer [if it] is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. 2778. As this regulation was issued pursuant to an express statutory authorization, makes sense of an ambiguous statutory provision, and is fully consistent with the purposes and history of the ADA, it is binding upon us.
 
 C. Other Courts
 
 75
 None of the cases upon which Events and Cowboys rely for a contrary conclusion persuades us that our reliance on 28 C.F.R. § 36.104, as construed by the agency that promulgated it, is incorrect.
 
 
 76
 Sandison v. Michigan High School Athletic Ass'n Inc., 64 F.3d 1026 (6th Cir. 1995), for example, did not hold that a facility owned by the state but operated by a private entity could never be a place of public accommodation. Rather, the court concluded that the private entity in that particular case — the Michigan High School Athletic Association (MHSAA) — did not operate the facilities in question:
 
 
 77
 The plaintiffs complain that the MHSAA age eligibility rule precludes them from equally participating in track events held on public school grounds or, presumably for cross-country events, in public parks. Public school grounds and public parks are of course operated by public entities, and thus cannot constitute public accommodations under title III.
 
 
 78
 Id. at 1036 (final emphasis added).[13] Further, Sandison was decided before PGA Tour, and may have assumed that an organization that sponsors an event for a limited period of time cannot be said to "operate" the location at which the event is held. PGA Tour is, as we have discussed, to the contrary.
 
 
 79
 Events and Cowboys also cite two circuit court cases holding that Title III does not apply to public entities. See Bloom v. Bexar County, 130 F.3d 722, 726 (5th Cir. 1997) ("ADA Title III expressly does not apply to public entities, including local governments."); DeBord v. Bd. of Educ., 126 F.3d 1102, 1106 (8th Cir.1997) ("Title III of the ADA applies to private entities providing public accommodations, . . . not to public entities. Entities subject to Title III include private schools, but not public ones.") (internal citations omitted). The complaint in this case does not, however, seek to hold a public entity liable under Title III, but, instead, to hold liable a private entity operating a facility owned by a public entity.
 
 
 80
 District courts addressing the applicability of Title III in circumstances similar to ours have generally held, consistently with 28 C.F.R. § 36.104, that Title III does apply, in opinions we find persuasive. Fiedler v. Am. Multi-Cinema, Inc., 871 F.Supp. 35 (D.D.C.1994), for example, considered whether AMC, the private operator of a movie theater, could be held liable under Title III. AMC leased the space for the theater from the federal government. In concluding that Title III was applicable to AMC although the federal government owned the property, the district court relied primarily upon the language of Title III, the DOJ regulations, and the DOJ Title III Technical Assistance Manual. See id. at 37-38. In addition, the court reasoned that the possibility that the government might be subject to different obligations than AMC with respect to the same property does not preclude Title III coverage, because "the ADA itself expressly contemplates that entities to which it applies might be subject to two or more separate sets of obligations. . . ." Id. at 37 (citing 42 U.S.C. § 12201(b), which provides that the statute shall not be construed to limit the scope of any federal law providing greater or equal protection to people with disabilities).
 
 
 81
 Similarly, in a set of cases involving private secondary school or college athletic associations whose member institutions include public schools, district courts have held that Title III applies where the private athletic association has sufficient contacts with the publicly owned facility that the association can be said to "operate" that facility. See Bowers v. Nat'l Collegiate Athletic Ass'n, 9 F.Supp.2d 460, 485-89 (D.N.J.1998) (holding that private college athletic association could be held liable under Title III for its operation of places of public accommodation owned by its member colleges and universities); Tatum v. Nat'l Collegiate Athletic Ass'n, 992 F.Supp. 1114, 1119-21 (E.D.Mo.1998) (holding that plaintiff had a "reasonable likelihood" of demonstrating that private college athletic association "operates" the athletic facilities owned by its member colleges and universities); Ganden v. Nat'l Collegiate Athletic Ass'n, No. 96 C 6953, 1996 WL 680000, at *11 (N.D.Ill. Nov.21, 1996) (holding that regardless of whether a public university owns or operates the athletic facility, private college athletic association may also "operate" the facility for Title III purposes); Butler v. Nat'l Collegiate Athletic Ass'n, No. C96-1656D, 1996 WL 1058233, at *4-5 (W.D.Wash. Nov.8, 1996) (noting that Title III does not provide that public entities operated by private entities cannot constitute public accommodations, and holding that the NCAA may be covered by Title III if it operates the athletic facilities owned by the state university). In holding that private entities can "operate" publicly owned facilities during athletic events, these district courts have focused on the precise nature of the private entity's control over the use of the facility during the events to determine whether the private entity may be considered the "operator" of the public accommodation during the event. See, e.g., Bowers, 9 F.Supp.2d at 486-87 (denying NCAA's motion for summary judgment where plaintiff had alleged that the NCAA exercises substantial control over the operations of the sports facilities during intercollegiate athletics, including selection of sites and dates for sporting events, specifying the size of fields, making ticket and seating arrangements, and establishing and enforcing rules of play).[14]
 
 
 82
 Our review of the statutory language, the purposes and history of Title III, the DOJ's implementing regulations, and the Supreme Court's guidance in PGA Tour leads us to agree with the approach of these courts. Under that approach, whether Title III applies to Events and Cowboys depends on whether those private entities exercise sufficient control over the Center, and in particular over the configuration of the facilities, even temporarily, with regard to accessibility, that they can be said to "operate" the stadium.
 
 
 83
 Disabled Rights has alleged that Events and Cowboys "operate" the Center for the duration of the Rodeo event. Disabled Rights should be permitted to develop the factual basis for that claim.
 
 
 84
 We now turn to the question whether University System must be joined as a defendant in this action.
 
 IV. JOINDER OF UNIVERSITY SYSTEM
 
 85
 Disabled Rights contends that the district court erred in finding that University System is a party that should have been joined in this proceeding. We agree.
 
 
 86
 Rule 19 of the Federal Rules of Civil Procedure sets forth considerations to guide a district court's determination whether a particular party should be joined in a suit if possible, referred to as a "necessary party," see Dawavendewa, 276 F.3d at 1154-55, and, if so, whether, if the party cannot be joined, the suit should be dismissed because the absent party is "indispensable." Rule 19(a) provides that a person shall if possible be joined as a party in the action if:
 
 
 87
 (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
 
 
 88
 FED. R. CIV. P. 19(a). Rule 19(b) provides that if a person meeting the elements of Rule 19(a) cannot be joined,
 
 
 89
 the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 
 
 90
 FED. R. CIV. P. 19(b).
 
 
 91
 A district court's joinder decision is generally reviewed under an abuse of discretion standard. See United States v. Bowen, 172 F.3d 682, 688 (9th Cir.1999); Kescoli v. Babbitt, 101 F.3d 1304, 1309 (9th Cir.1996). However, as is usual, legal conclusions that underlie the district court's decision are reviewed de novo. See Bowen, 172 F.3d at 688; see also Dawavendewa, 276 F.3d at 1154.
 
 
 92
 We now turn to the discrete analysis required by Rule 19.
 
 A. Rule 19(a)(1) — Complete Relief
 
 93
 Under Rule 19(a), a party may be "necessary" in either of two ways. See Dawavendewa, 276 F.3d at 1155. Under Rule 19(a)(1), a party is deemed "necessary" if complete relief cannot be granted in its absence. "This factor is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir.1983). In conducting the Rule 19(a)(1) analysis, the court asks whether the absence of the party would preclude the district court from fashioning meaningful relief as between the parties. See id.
 
 
 94
 In its original complaint, Disabled Rights sought a permanent injunction enjoining Events and Cowboys from engaging in discrimination on the basis of disability in violation of Title III and requiring them to cease "operating" the Center during the Rodeo unless and until they can do so in full compliance with the ADA. The complaint sought to enjoin only the private defendants' actions. In reaching its decision, the district court entirely failed to consider whether remedies not requiring University System's cooperation would provide meaningful relief.
 
 
 95
 It is apparent to us that such remedies are available. First, it is important to consider that the maximum relief available with respect to the removal of architectural or communications barriers under Title III is limited to those steps that are "readily achievable" by the covered entity. See 42 U.S.C. §§ 12182(b)(2)(A)(iv) & (v), 12181(9).[15] "The economic situation of a public accommodation [operator] is taken into account in assessing whether the removal of architectural barriers or the provision of auxiliary aids is `readily achievable.'" Botosan, 216 F.3d at 834 n. 2 (citing 42 U.S.C. § 12181(9)). Also relevant is the "administrative or fiscal relationship of the facility or facilities in question to the covered entity." 42 U.S.C. § 12181(9)(D). Accordingly, the private defendants' Title III obligation would be determined with respect to the short term nature of its relationship with the Center, among other considerations, and "complete relief" under the statute may not necessarily mean the achievement of a fully accessible stadium.
 
 
 96
 Meaningful relief could thus be granted by enjoining Events and Cowboys from making certain kinds of operational decisions regarding conditions over which they have control — e.g., enjoining them from removing accessible floor seating, or requiring the erection of temporary ramps or lifts. Meaningful relief could also be granted by requiring Events and Cowboys to hold the Rodeo at an accessible venue either immediately, or in the future, after the current provisions of its licensing agreement expire. These forms of relief, which are neither hollow nor meaningless, would be available with or without University System's participation. See Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc., 299 F.3d 1007, 1014-15 (9th Cir.2002) (concluding that complete relief was possible where relief was available regardless of the absent party's participation).
 
 
 97
 Dawavendewa does not mandate a contrary conclusion. In Dawavendewa, the plaintiff sought to invalidate a hiring preference that was required as a term of the employer's lease with the absent party, the Navajo Nation. See 276 F.3d at 1155. The court explained that without the participation of the Navajo Nation, Dawavendewa would be unable to obtain his requested relief — employment by the defendant — because even if an injunction issued against the employer, the Navajo Nation could move to enforce its rights under the lease and ultimately evict the employer from the reservation. See id. In that event, Dawavendewa would continue to be unable to obtain the employment he sought. See id.
 
 
 98
 Here, however, the licensing agreement with University System, unlike the lease in Dawavendewa, does not prevent Events from taking action to make the Rodeo accessible to the degree possible within the scope of its lease or, in the alternative, from holding the Rodeo at an accessible venue. In the latter event, were University System to attempt to enforce the licensing agreement against Events, Events would be required to pay liquidated damages, not to hold the Rodeo at the Center despite its inaccessibility. Disabled Rights would still be able to obtain its objective of having the Rodeo presented at an accessible location.
 
 
 99
 Accordingly, we conclude that the district court abused its discretion in concluding that absent University System, no meaningful relief is possible, so that University System is a necessary party under Rule 19(a)(1).
 
 
 100
 B. Rule 19(a)(2) — Protection of Legally Cognizable Interests
 
 
 101
 Rule 19(a)(2) focuses on whether the absent party's participation is necessary to protect its legally cognizable interests or to protect other parties from a substantial risk of incurring multiple or inconsistent obligations because of those interests. See FED. R. CIV. P. 19(a)(2)(i) & (ii).
 
 
 102
 1. University System's Interest as a Contractual Party
 
 
 103
 Events and University System maintain that University System is a necessary party in this action for injunctive relief under Rule 19(a) simply because it is a signatory to a contract with Events running through 2009.
 
 
 104
 For this proposition, the defendants rely on Lomayaktewa v. Hathaway, 520 F.2d 1324 (9th Cir.1975), and its progeny. Lomayaktewa pronounced that "[n]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." Id. at 1325. Dawavendewa "reaffirm[ed] the fundamental principle [that] a party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract." Dawavendewa, 276 F.3d at 1157; see also Clinton v. Babbitt, 180 F.3d 1081, 1088 (9th Cir.1999) ("[A] district court cannot adjudicate an attack on the terms of a negotiated agreement without jurisdiction over the parties to that agreement.").
 
 
 105
 In none of these formulations is that principle here applicable. We note, first, that contrary to Events' representation, Events is not bound by the licensing agreement through the year 2009. Rather, the licensing agreement explicitly provides that "[t]he term of this agreement is three (3) years with three (3), two-year options," beginning in 2001. By the terms of the agreement, after 2003 Events may choose to exercise its option to hold the Rodeo at the Center. The record does not indicate whether Events has exercised its option beyond 2003. As a result, the record does not establish that University System has any legal interest as a party to a binding contract beyond 2003.
 
 
 106
 Second and even more important, even if there is a contract binding into the future, the Lomayaktewa rule does not resolve this case. Disabled Rights' suit is not "an action to set aside ... a contract," Dawavendewa, 276 F.3d at 1156 (quoting Lomayaktewa, 520 F.2d at 1325), an "attack on the terms of a negotiated agreement," Clinton, 180 F.3d at 1088, or "litigation seeking to decimate [a] contract." Dawavendewa, 276 F.3d at 1157. Rather, Disabled Rights seeks Events' and Cowboys' compliance with Title III of the ADA. No term of the contract requires discrimination on the basis of disability or precludes Events and Cowboys from accommodating disabled individuals to the extent Title III requires them to do so. Thus, if Disabled Rights is successful, the contract would not be invalidated or "set aside," but would remain legally binding.
 
 
 107
 It is possible, of course, that if Events and Cowboys are ordered to comply with Title III, they may decide to hold the Rodeo elsewhere. If Events and Cowboys do so choose, then University System might have an action against Events for breach of contract for any damage suffered as a result of the private entities' refusal to abide by their agreement. University System would be free, for example, to enforce the licensing agreement, which contains a cancellation clause giving Events the right to cancel the Rodeo at the Center by paying a specified amount of liquidated damages. But the judgment itself would not mandate any change in the agreement, or any breach. Instead, like many other external events — a drop in the financial fortunes of the group sponsoring the event, or an increase in its insurance premiums due to safety concerns — the judgment could precipitate one party to refuse to perform, in which case the other party would have its legal remedies.
 
 
 108
 The facts of Dawavendewa illuminate the determinative distinction between a case in which the judgment will necessarily "set aside" the contract and a case such as this one, where it will not. As discussed above, in Dawavendewa, a lease agreement between the Navajo Nation and a lessee of Navajo property mandated compliance with a hiring policy giving preference to Navajos. The question in the case was whether that policy violated Title VII. See Dawavendewa, 276 F.3d at 1157. The plaintiff's challenge to the lessee's preferential hiring policy necessarily alleged that the contract itself was illegal.
 
 
 109
 In contrast, Disabled Rights does not allege that the licensing agreement is illegal, on its face or otherwise, and indeed, could not so allege, as nothing in the agreement addresses access by or discrimination against disabled individuals.[16] Moreover, in Dawavendewa, the Navajo Nation had specifically bargained for the hiring preference as the primary consideration for the lease, so the invalidation of that provision would essentially decimate the Nation's bargained-for rights. See id. Here, there is no allegation that University System had as an objective in negotiating the contract, let alone a primary objective, preservation of a physically inaccessible venue. Disabled Rights' suit thus does not threaten to destroy the contract nor University System's bargained-for rights. Rather, as explained above, University System bargained for a liquidated damages clause, so its contractual rights would remain fully protected in the event of a judgment in Disabled Rights' favor resulting in cancellation of the agreement. Nor is it a foregone conclusion that a judgment in Disabled Rights' favor would result in such cancellation.
 
 
 110
 Accordingly, we reject the contention that University System must be deemed necessary merely by virtue of its status as a party to a licensing agreement with Events.
 
 2. Other Interests
 
 111
 Events further contends that University System's legally cognizable interests are implicated because a judgment in Disabled Rights' favor would amount to a declaration that University System is operating a facility in violation of the ADA. Yet, the pertinent legal question is not whether the Center's operation by University System violates Title II, but rather whether the Center's operation by Events and Cowboys violates Title III. As Events, Cowboys, and University System acknowledge, Title III imposes obligations distinct from those imposed by Title II, and more onerous ones. So, a judgment in Disabled Rights' favor would not determine that University System's operation of the Center violates the ADA. See Title II Technical Assistance Manual, at III-1.7000 (explaining that a public entity acting as a landlord to a public accommodation is subject to title II, and that "[a]s a public entity, it cannot be subject to title III, even though its tenants are public accommodations that are covered by title III"); see also Johnson v. City of Saline, 151 F.3d 564, 571-72 (6th Cir.1998) ("Even though the [private] businesses may be subject to Title III of the ADA . . ., the city is simultaneously subject to Title II because it is a landlord.").
 
 
 112
 In this respect, this case is markedly different from one involving exclusively private entities, all of whom are covered by Title III. In Botosan, a case involving a private landlord and private tenant both covered by Title III, we suggested in passing that "the landlord is a necessary party in an ADA action, regardless of what the lease provides." 216 F.3d at 834. In that case, which did not involve any question of joinder under Rule 19, we held that both landlord and tenant may be held liable for violations of the ADA regardless of the allocation of responsibility provided for in the lease. See id. Citing 28 C.F.R. § 36.201(b), we explained that both the private landlord and tenant are subject to the requirements of Title III, and any allocation of that responsibility in the lease "is effective only `[a]s between the parties.'" Id. at 833. In this case, as explained above, University System is solely responsible, under the ADA, for ensuring that the Center complies with Title II, while the private defendants are solely responsible, under the ADA, for ensuring that the venue at which they hold the Rodeo complies with Title III. As their respective statutory obligations are not identical, University System is not a necessary party to an adjudication of the extent of the private defendants' compliance with Title III.
 
 
 113
 Events also suggests that an injunction enjoining private parties from using the Center would interfere with University System's interest in the administration of state property. An injunction preventing private entities from operating the Center in a manner that violates Title III, however, does not restrain the actions of the State of Nevada or compel it to act.
 
 
 114
 University System similarly claims that it has a legally protected interest in future contractual relations with Events or other entities. See Am. Greyhound Racing, Inc. v. Hull, 305 F.3d 1015, 1024 (9th Cir.2002). American Greyhound Racing reasoned that the fact that the district court's injunction applied only to the execution of future compacts or extension of existing ones did not limit the prejudice to the absent party's legal interests, as the injunction amounted to a declaratory judgment that the absent party's activities were illegal. See id. ("The sovereign power of the tribes to negotiate compacts is impaired by the ruling."). Here, for reasons already discussed, a judgment against Events and Cowboys would not be the equivalent of a declaratory judgment that University System's operations are illegal.
 
 
 115
 Although this lawsuit does not bear on the extent of University System's own compliance with Title II, it is true that, as a practical matter, a judgment against Events or Cowboys could dissuade other private entities subject to Title III from entering into agreements with University System for use of the Center. We are cognizant that, should Disabled Rights prevail, University System stands to lose a valuable source of income — not an insubstantial consideration. But a financial stake in the outcome of the litigation is not a legally protected interest giving rise to § 19(a)(2) necessity. See Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir.1990).
 
 
 116
 Accordingly, we hold that the district court abused its discretion in concluding that University System is a necessary party. Because University System is not a necessary party under Rule 19(a), we do not consider under Rule 19(b) whether the action should be dismissed because the absent party cannot be joined.[17]
 
 
 117
 We note in closing that ordinarily, in a case in which the property owner is a public entity and the operator of the public accommodation is a private entity, it will be in the plaintiff's best interest to sue both the landlord, under Title II, and the operator of the public accommodation, under Title III, thereby affording the court the greatest flexibility in fashioning appropriate relief. We hold only that in this particular case, Disabled Rights' suit against the private operators of a public accommodation for violations of Title III may go forward without the joinder of University System, a public entity not subject to Title III.
 
 V. CONCLUSION
 
 118
 For the reasons set forth above, we REVERSE the district court's dismissal of the action against Events and Cowboys, REVERSE the district court's order that University System be joined as an indispensable party, and REMAND for further proceedings.
 
 
 
 Notes:
 
 
 [1]
 The district court record includes only a redacted License Agreement indicating that Events contracted with University System for permission to present the Rodeo at the Center every year from 1993 through 2000. The License Agreement that is currently in effect was not part of the district court record. Events has filed an unopposed motion for judicial notice of an unredacted copy of the licensing agreement in effect at the time the district court ruled on the joinder motion, as well as of the current licensing agreement. We grant the motion. These licensing agreements are documents of the University System, a state entity. Under Federal Rule of Evidence 201, we may take judicial notice of the records of state agencies and other undisputed matters of public recordSee Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir.2001) (explaining that a court may judicially notice matters of public record unless the matter is a fact subject to reasonable dispute); Kottle v. N.W. Kidney Ctrs., 146 F.3d 1056, 1064 n. 7 (9th Cir.1998) (holding that state health department records were properly judicially noticed); Mack v. S. Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir. 1986) (stating that a court may take judicial notice of records and reports of state administrative bodies), overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).
 
 
 [2]
 Counsel for Events explained to the district court that this part of the agreement envisions that "seating changes will occur to a certain extent to accommodate the use of the arena for the [Rodeo], which has lots of big animals running in and out of the arena."
 
 
 [3]
 The complaint did not explain what is meant by "higher ticket prices."
 
 
 [4]
 Only injunctive relief is available under Title IIIWander v. Kaus, 304 F.3d 856, 858 (9th Cir.2002) (citing 42 U.S.C. § 12188(a)(1)).
 
 
 [5]
 The court invoked both Federal Rule of Civil Procedure 19(a)USFRCPR19, dealing with parties traditionally denominated as "necessary," and 19(b), dealing with "indispensable" parties, in its dismissal of the complaint. The terms "necessary" and "indispensable" are terms of art in Rule 19 jurisprudence: "Necessary" refers to a party who should be "[j]oined if [f]easible." FED. R. Civ. P. 19(a);see also Dawavendewa v. Salt River Project Agric. Improvement & Power Dist., 276 F.3d 1150, 1154-55 (9th Cir. 2002). "Indispensable" refers to a party whose participation is so important to the resolution of the case that, if the joinder of the party is not feasible, the suit must be dismissed. FED. R. CIV. P. 19(b); see also infra at 878-883 (discussing Rule 19 in depth).
 Here, the district court ordered Disabled Rights to file an amended complaint joining the UNLV Center as a party. Thus, although the district court invoked Rule 19(b), it did not determine at that juncture that the UNLV Center could not be joined as a party, or, if so, why. Rather, it decided only that if it could not be made a party, then the suit would be dismissed for failure to join an indispensable party.
 This is an odd way to proceed with regard to the application of Rule 19(b), likely, in some circumstances, to be impermissible. The reason a Rule 19 defendant cannot be joined could well be pertinent to the analysis of the Rule 19(b) factors. As we shall explain, see infra at 9232, Rule 19(b) requires the court to determine whether "in equity and good conscience" the suit should terminate in the defendant's absence. In conducting this inquiry, the court must consider "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." FED. R. CIV. P. 19(b). Thus, for example, if the reason a particular defendant cannot be joined is lack of personal jurisdiction in the chosen venue, it might be possible to sue all the pertinent parties elsewhere. In that event, the plaintiff would have an adequate remedy; otherwise, it might not.
 Because we ultimately conclude that University System is not a necessary party under Rule 19(a), we do not reach the Rule 19(b) question.
 
 
 [6]
 The district court's February 7, 2001, order directed Disabled Rights to join "the University of Nevada, Las Vegas, Thomas & Mack Center," a sub-unit of the Nevada state university system and thus not a proper party defendant. After learning that the UNLV Center could not be served and the proper legal entity was University System, Disabled Rights filed a Rule 60 motion to modify the order. The district court granted the motion on March 8, 2002, modifying the order to refer not to the Center but to "the indispensable party."
 
 
 [7]
 Cowboys also argues that because Disabled Rights' notice of appeal mentions only the final judgment of September 27, 2002, Disabled Rights is precluded from appealing the earlier orders dismissing Events and Cowboys. This argument fails. As we explained inHarvey v. Waldron, "[a]n appeal from a final judgment draws in question all earlier, non-final orders and rulings which produced the judgment." 210 F.3d 1008, 1012 (9th Cir.2000) (internal quotation marks and citation omitted). Cf. Montes, 37 F.3d at 1351 (concluding that failure of notice of appeal to specify earlier order did not bar appeal where "the intent to appeal a specific judgment [could] be fairly inferred and the appellee [was] not prejudiced by the mistake") (internal quotations marks and citation omitted).
 
 
 [8]
 The House of Representatives Committee Report explained:
 The intent of the[se] contractual prohibitions ... is to prohibit a public accommodation from doing indirectly through a contractual relationship, what it may not do directly.
 . . .
 [A] covered entity may not use a contractual provision to reduce any of its obligations under this Act. In sum, a public accommodation's obligations are not extended or changed in any manner by virtue of its lease with the other entity.
 H.R.Rep. No. 101-485(II), at 101, 104 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 384, 387.
 
 
 [9]
 We had reached the same conclusion with respect to Title III's coverage of PGA Tour's short-term operation of golf coursesSee Martin v. PGA Tour, Inc., 204 F.3d 994, 996 & n. 3 (9th Cir.2000), aff'd, 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). In Martin, we stated that "[o]n days of tour competition, PGA is the operator of the golf course." Id. at 996. We explained,
 The term "operates," as it is used in the ADA, is extensive and "would include sublessees, management companies, and any other entity that owns, leases, leases to, or operates a place of public accommodation, even if the operation is only for a short time." 28 C.F.R. ch. I, pt. 36, app. B., at 628 (1999).
 Id. at n. 3 (emphasis added).
 
 
 [10]
 The petitioner-defendant, PGA Tour, had acknowledged that its golf tournaments were "conducted at places of public accommodation." See PGA Tour, 532 U.S. at 677, 121 S.Ct. 1879 (emphasis added). That acknowledgment, however, does not reach the question the court decided before noting that acknowledgment — whether the sponsor of a short-term event is covered by Title III of the ADA.
 
 
 [11]
 While the statute defines "private entity" to exclude "public entities," it says nothing about the meaning of "entity."See 42 U.S.C. § 12181(6).
 
 
 [12]
 The Title II Technical Assistance Manual similarly elaborates:
 In many situations ... public entities have a close relationship to private entities that are covered by title III, with the result that certain activities may be at least indirectly affected by both titles.
 ILLUSTRATION 1: A privately owned restaurant in a State park operates for the convenience of park users under a concession agreement with a State department of parks. As a public accommodation, the restaurant is subject to title III and must meet those obligations....
 ILLUSTRATION 2: A city owns a downtown office building occupied by its department of human resources. The building's first floor, however, is leased to a restaurant, a newsstand, and a travel agency. The city, as a public entity and landlord of the office building, is subject to title II. As a public entity, it is not subject to title III, even though its tenants are public accommodations that are covered by title III.
 Americans with Disabilities Act Title II Technical Assistance Manual Covering State and Local Government Programs and Services, at II-1.3000 (1993), available at http:// www.usdoj.gov/crt/ada/taman2.html [hereinafter "Title II Technical Assistance Manual"].
 
 
 [13]
 One cannot tell precisely whySandison ruled as it did on the facts of the case before it, as the opinion does not elucidate the terms of the relationship between MHSAA and the public entities that own the venues for its sporting events. See cases discussed infra, at 9229-30 (holding after surveying particular circumstances that athletic associations such as the NCAA do "operate" the public athletic facilities at which their members play).
 
 
 [14]
 The Fifth Circuit similarly construed the term "operate" inNeff v. American Dairy Queen Corp., 58 F.3d 1063 (5th Cir.1995). Noting that the term is not defined in the ADA, the court "construe[d] it in accord with its ordinary [or] natural meaning." Id. at 1066 (quoting Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)). The court reasoned:
 To "operate," in the context of a business operation, means "to put or keep in operation," The Random House College Dictionary 931 (Rev. ed.1980), "[t]o control or direct the functioning of," Webster's II: New Riverside University Dictionary 823 (1988), "[t]o conduct the affairs of; manage," The American Heritage Dictionary 1268 (3d ed.1992).
 Id. (alteration in original). The Fifth Circuit concluded that the relevant inquiry was whether the entity "specifically controls the modification of the [facilities] to improve their accessibility to the disabled." Id. Relying on Neff, the Third Circuit has adopted a similar construction of the term "operates," focusing on whether the entity in question has "the power to make accommodations." Emerson v. Thiel Coll., 296 F.3d 184, 189 & n. 3 (3d Cir.2002).
 
 
 [15]
 An action is "readily achievable" if it is "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). In determining whether an action is "readily achievable," the following four factors are considered:
 (A) the nature and cost of the action needed under this chapter;
 (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;
 (C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
 (D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.
 
 Id.
 
 
 
 [16]
 Indeed, the agreement requires that Events "shall use the Licensed Space in a safe and careful manner and fully comply with and observe in all respects all laws, ordinances, rules and regulations of all Federal, State and local government agencies having jurisdiction."
 
 
 [17]
 It is also therefore unnecessary to consider the University System's contentions that it cannot be joined as a defendant because, as a sub-entity of the State of Nevada, it is immune from suit under the Eleventh Amendment, or because it is not subject to suit under Title III